All patent cases, one from the District Court and three from the PTAB. First case is Joao Bock Transaction Systems v. Jack Henry & Associates, 2016-18-87, Mr. Richardson. Good morning, Your Honor, and may it please the Court. In arriving at its fee award, the District Court erred in three important ways. First, the District Court failed to recognize that abusive and bad faith conduct, not permitted conduct, must be found in order to support a 285 fee award. This is legal error. In addition, the District Court failed to evaluate the totality of the circumstances, and in doing so, relied on a clearly erroneous assessment of the evidence. This is another error. The Court noted that you had lots of claims, more than 400 claims. You kept on changing the ones to focus on, and the very experienced judge didn't give them what they wanted, but she assessed, what, a million dollars in fees? A million dollars, that's correct, Your Honor, which leads to the third error, which was to arbitrarily select that million dollars. But in relying on less than the totality of the circumstances, and on relying on an erroneous understanding of the law, the Court erred and abused her discretion in arriving at this fee award for those three reasons. You're saying a very experienced judge, probably having sat for 30 years, didn't know the law? Your Honor, I would say it differently, which is that the law was evolving at the time. We saw in Octane Fitness what was a change in the law that brought us back to the 1946 style of fee award, which was set in Section 70 of the then Amendment to the Patent Act. And so we saw this change, and Octane Fitness directs us back to that, using the language of equity, using the language of bad faith. What did she fail to consider that she should have considered? I'm sorry? What did she fail to consider that she should have considered? There's a number of important things, Your Honor. The first one is the District Court spends a great deal of time evaluating what she called the shifting infringement positions. In looking at that, she failed to consider that she herself actually encouraged the parties to engage in that shifting of infringement conditions, or infringement contentions. And we see that in the record, particularly in the September 29, 2014 transcript, which is part of the record. And in that, she very clearly says that she is adopting a new procedure for our case that allowed the parties to conduct claim construction before the final infringement contentions were set. And that language, I think, is very important. But that's a suggestion that the thing that she relied on, the shifting infringement contentions, wasn't bad conduct. Yes. But apart from that, is there something that you think she needed to consider that she didn't mention that somehow taints the decision? I believe the underlying issue there, Your Honor, was that this was a new procedure for her. And that perhaps because of the passage of time, she simply forgot that we were, according to her, her guinea pig. And that was, again, what she didn't consider, the totality of the circumstances that she didn't consider, was that she herself not only permitted the conduct, but encouraged it. And that's at page 28 of the September 29 transcript, when she says she interrupts Mr. Jones, who had complained about a shift in infringement contentions. And she said, I actually thought the purpose of having claim construction before expert discovery was so that the experts could address and formulate their opinions consistently, to the extent they could, with my claim construction. So I just want to make sure, before you start your argument, Assistant Mr. Jones, that you understand that some shifting in position I thought would be expected. And that's what we have here, is the confluence of two things. The judge's involvement in the infringement process allowed us to make those changes. The change in her structure of her patent cases, so that claim construction was done very early. And in fact, she encouraged us to engage in the very behavior that then, some months later, she criticized in her fee award. If she had considered the totality of the circumstances, that was that this was not only not bad conduct, but was permitted and encouraged conduct, she could not have found that that conduct was sufficient to support a 285 fee award. What about the allocation of the fees? She allowed about a third of the fees, even if you're correct, that in these 285 cases there has to be some allocation of fees between those caused by bad conduct and those caused by other things. Why isn't what she did perfectly appropriate? I believe because it appears to have been an arbitrarily selected number. I agree that it is approximately a third of the fees that were requested, but there's no explanation for how that fee was arrived at. And because of the fact that it is such a round number, it does appear to have an arbitrary basis, rather than the basis that the Third Circuit has required, which is the Lodestar calculation, which is not only the reasonableness of the hourly rate, which she did address, but also the reasonableness of the time spent. I agree, Your Honor, it is important that there be a tie between the purported misconduct, which she didn't find, by the way, but the purported misconduct and the fee award, and that isn't here. And so that is a fundamental error that undermines the fee award. But if we look at the other conduct that she pointed to, we have similar issues. For example, the idea of a representative product. The idea of a representative product really goes back to our fulfilling our responsibility to try to streamline litigation. What we had was a defendant that had many dozens of products that it had acquired that practiced our client's patent. We worked with the court and with Mr. Jones and his client in order to try to arrive at a solution to that, and that was the representative product approach. And it was a dialogue, a negotiation between the three groups there, the court, the defendant, and the plaintiff, where we arrived at a negotiated resolution. And we submit that that should not be the basis of a finding of misconduct. That's not misconduct. That's fulfilling our responsibility to work cooperatively to streamline the process. She didn't say misconduct. It's an exceptional case. The record indicates that plaintiff-pursued litigation so inefficiently has to be objectively unreasonable and burdensome for the defendant and the court. Yes, Your Honor. But in this case, there's a qualitative difference between inefficiency and the sort of conduct that's required in order to arrive at a 285 fee shifting. The language I would point you to is in two places. One is anchored in Octane Fitness itself, and that's in the early discussion of the relationship between Section 70 and Section 285. And in that, the court notes that the provision, then Provision 70, which then the Supreme Court acknowledges flows through to the current 285. The provision enabled them to address, quote, unfairness or bad faith in the conduct of the losing party or some other equitable consideration of similar force, which made a case so unusual as to warrant fee shifting. And there's a very important case that came out last year, in June of last year, and that's the case of Checkpoint Systems v. Alltag. Well, look, the judge said plaintiff's initial notice of accused products contained more than 80 products that allegedly infringed 67 claims. The plaintiff then changed the identity of the representative products at least four times. And so I don't think she used the word bad faith, but she certainly used exceptional conduct. Well, Your Honor, merely identifying infringing products cannot itself be bad faith. That can't be evidence of misconduct. You keep saying bad faith. Is that the standard? Your Honor, I believe it is, in that I would point to the Checkpoint Systems case from last year, which does go through the Senate report language that has been adopted through Octane Fitness's opinion as well as through Checkpoint. It is bad faith. The passage from Octane Fitness we just read didn't stop at bad faith. It included unfairness or other equitable principles. It did, but the language that I was pointing to from Checkpoint, which reviews what Octane Fitness was saying, reviews what the Congress intended to do with Section 285, that is, through Section 70, focuses on things that uses very important language. For example, the Senate report reads, the exercise of discretion in favor of awarding attorney fees should be bottomed upon the finding of unfairness or bad faith in the conduct of the losing party. But that's just the language you read to me from Octane Fitness. It seems to me that you can find unfairness to the defendant without it rising to the level of bad faith. I believe that you need to have some form of misconduct. It cannot be permitted conduct that underlies these equity principles. Otherwise, we'd be punishing litigants. Why not? You can have entirely abusive litigation tactics that aren't prohibited by any discovery rules, by any statute or the like, but they're still abusive and unfair. In that case, then, the conduct would not be permitted, and certainly not as in this case where they were expressly encouraged by the court. Well, we see cases all the time that at least I think have abusive litigation tactics, but they don't violate any rules of civil procedure or evidence or discovery or anything like that. I believe that there are certain prohibitions against abusive litigation tactics, whether it arises of things like Rule 11 or Section 1927. You're certainly not saying that Rule 11 is required. The standard for Rule 11 is required to be met for 285. No, absolutely not. Absolutely not. But what I'm saying is that there are other prohibitions. There are other ways to address abusive litigation such that we are certain that abusive litigation tactics would not be permitted tactics. Wait, wait, wait. I don't understand. Are you saying that abusive litigation tactics can't be sanctioned under 285? I'm saying that abusive litigation tactics can. But that would be I'm trying to distinguish between abusive litigation, which is a form of misconduct, and the sort of permitted conduct that we had in this case. Well, I don't understand what you mean by permitted. She certainly didn't say it was permitted. She said that she behaved in a bad way. Your Honor, respectfully, she did say it was permitted. Where did she say it was permitted? In the passage from the transcript that I just referred you to, she absolutely, and this is at the end of fact discovery, after claim construction, at the end of expert discovery. Can you comment on what she said there? She said, I actually thought the purpose of having claim construction before expert discovery was so that the experts could address and formulate their opinions consistently, to the extent they could, with my claim construction. How is that saying your conduct is permissive? Because she was encouraging the parties to take into account her claim construction and then modify their infringement contentions to reflect those different or changed claim constructions that she entered. And in fact, that's what she did in this case. She did adopt some claim constructions that were not proposed by either party. And all that was done, and all that the record supports, is that we made changes to reflect her claim construction. And she, at the end of the case, at the very end of the case in September, said, I expected you to do that. And she cut off the Jack Henry's counsel and said, understand, they're supposed to be, they're allowed to be, changing positions. And that's all we did. Mr. Richardson, you're into your rebuttal time. You can continue to use it or save it, as you indicated. Your Honor, I'll reserve my rebuttal time. Thank you. Mr. Jones. Thank you. May it please the Court. As the Court observed, we have your opinion. Is it true that the plaintiff in this case did no more than adjust his infringement theories to take account of the claim construction? No, Your Honor. That's not accurate. If you look at the timing of what happened, we have the original complaint, which was in September of 2012, which accused two products. In the first identification of accused instrumentalities in March of 2013, that was enlarged to over 80 products, infringing 67 claims. In May of 2013, and this is all more than a year before the conference that Mr. Richardson was just referring to, in May of 2013, they served their initial infringement contentions. Now we have 65 products and 36 claims. So we've gone from 2 to 80 to 65. We asked them to reduce these numbers because of the significant discovery burden that this was going to impose, and there's plenty of evidence in the record as to what that burden was. In January of 2014, we finally had a court conference in which the Court ordered the plaintiff to reduce the number of asserted accused products to between 6 and 8 and to rank them. Instead, what they did was to name seven products but say that these seven were representative of 47 others. We did, in fact, communicate with both counsel and the court about our concerns as to this representative product approach. It required that every time they said product A is representative of product B, our people had to go take a look at the technology involved and decide whether those two things really were the same. And if you look at page 740 in the appendix, we have there a chart showing the varying theories of representative products that the other side put forth. There were products in the first list that disappeared in the second. There were products in the second that disappeared in the third. In fact, there were only two products of the seven that maintained their status all the way through. We changed again in February. They changed again in May. They served final infringement contentions in July, and this was a month after the Markman hearing and after the Markman decision came down. And the problem here was that they added six new claims that had never been asserted before, that had never been the subject of discovery, had never been charted. And we complained about that, and the court at the July 21st telephone conference said, no, you can't do that. They withdrew the six. They put four back in, and then they promised to have their expert sort it all out. So by the time we had that conference in September, to which Mr. Richeson was referring, we had already undergone the burden of all this discovery, dozens of depositions, more than a million pages of documents, 10,000 core technical documents that had to be produced, 294,000 emails that had had to be produced because of what they required in terms of search terms. So all of this burden, all of this work had taken place over the year and a half before the September conference. And keep in mind, Your Honor, all Judge Robinson said at the September 20, I believe it's September 24th, 2014 conference, was she was explaining her thinking in terms of, for the first time, having the expert reports come after Markman. That was the change that she did. And she did say we were the first case in which she had tried that. I'm actually not sure she thought it worked out very well. And part of the problem was all these changes and shifts that happened before that we do Markman, we have more changes and shifts. And it wasn't just making minor changes around the edges to take into account the Markman decision. It was wholesale changes to both the claims and the accused products. That was only one of the things that Judge Robinson found to be the basis for fees. And let me address the standard issue, if I might, just for a second. We've used the term litigation misconduct. That is really a shorthand term. What the court said in Octane Fitness, the Supreme Court said that one of the bases for fees is the unreasonable manner in which the case was argued. That's 134 Supreme Court at 1756. That's all that's required. Bad faith was the old standard that Octane Fitness did away with. An unreasonable manner in which the case was argued. That is exactly what Judge Robinson found. She found it in connection with the motion to strike, the unnecessary and overruled motion to strike that was the first thing out of the box. The refusal to reduce the scope of the claims and the accused products. These changing, shifting infringement theories that she discussed at length in her opinion. She found an unreasonable manner of conduct during the Markman proceeding, focusing on these definitions that had been added into the patent file history eight years after the original specification and application had been filed. Admittedly, in order to try to say that the words in the 725 patent, which is the parent, the same words, the same specification, and very much the same claims. Well, those words mean something different in the 003 patent because we didn't like what the judge did in construing 725. Judge Robinson found that to be unhappy conduct. She called it turning Markman principles on its head. She also found that there was no evidence of a pre-suit investigation. Mr. Joe said he didn't do it. Mr. Box said he didn't do it. The expert didn't do it because he hadn't been retained for almost two years after the case was filed. And there was no evidence that anybody did it. Those were the things that Judge Robinson focused on in terms of unreasonable manner in which the case was litigated. This resulted in, as I said, wasted, she found, wasted depositions. Depositions of people that, after they testified about why the product didn't do what the plaintiff said it did, it got dropped. And it wasn't just one. What about the amount of the award? I'm sorry? What about the amount of the award? It is undeniable that Judge Robinson did not give us a whole lot of guidance as to exactly how she came up with the number. However, I would direct the court to the Fox versus Vice case from the United States Supreme Court in 2011. It's a case. It was a civil rights case. There was a fee shifting at issue there. And the court said, trial courts need not and indeed should not become green eyeshade accountants. The essential goal in shifting fees to either party is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of the suit and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations. That was what the Supreme Court said. There was no obligation in the cases in anything that required Judge Robinson to sit down, as the court said, put on the green eyeshade, and go through the bills and say, well, I'll give you this and I'll give you that. I won't give you this. I won't give you that. She did rough justice. Shouldn't the district courts be required to give some reason, though, for the allocation? I mean, it makes it hard for us to review, assuming there's an allocation required, that decision, even under a very deferential standard if we don't know the reason. If you look at the footnote at the end of her opinion and the language that she used in telling us all why she gave the number she gave, it's very clear that her intention was to try to do, the rough justice here was, I'm going to award Jack Henry the amount of fees that I think represents what it spent more than what it should have had to spend. That was what she was trying to do. Because of all of these changes, shifts, theories, scope issues, because of the unreasonable manner, I think this case cost Jack Henry a million dollars more than it should have, and so that's what I'm going to award. Clearly and plainly within her discretion. The, let me talk, let me just touch on checkpoint. That was discussed in the other side's opening argument. That was a distinguishable case. The court there, this was a case in which this court found that the district court just plain got the facts wrong. And that's the basis of which virtually every case in which the federal circuit has reversed a fee award has relied. The district court just plain got the facts wrong. For example, in checkpoint, the district court said there was no pre-suit investigation. The federal circuit reviewed the record and said, well, there were two opinions of counsel. They said that the expert, the district court said the expert had evaluated the wrong product. The federal circuit pointed out that the product it had evaluated was admittedly exactly the same as the other one. This is a distinguishable case, and there's nothing in checkpoint that takes the standard back to the old pre-octane fitness, bad faith, bad faith standard. I have time left, but really I think the best thing to do is to, is to summarize very quickly. And there's no reason to second guess Judge Robinson's views here. She reviewed the evidence. Keep in mind that this was a case in which the court had seven conferences with the council, discovery conferences, status conferences, motion conferences. There were two filed and one threatened emergency motions that the judge took up dealing with these issues. She said that she spent more time on this case with us than she spent on virtually any case that she had had over her long career. She applied the right law. She looked at the totality of the circumstances. She awarded the proportion of the fee that, in her judgment, represented how much Jack Henry should not have had to spend. And there's no abuse of discretion and no reason for this court to disturb her judgment. If you have no more questions, I will be done. Thank you, counsel. Thank you, Your Honor. Mr. Richardson has two minutes to follow. Thank you, Your Honor. With respect to the arbitrary selection of a million dollars, because that's what it was, there is simply no analysis that was done in order to validate whether that was an appropriate amount or an excessively high amount, which is what we would believe. Did you argue that it was excessively high? We did argue that there was no support, Your Honor, and that is in the opposition to fees. That seems to me a bit of a different argument. Did you argue that it was excessive? I believe that we did argue that it was excessive, although I don't know that that exact language was used. Did you argue for a different amount? We did not, Your Honor. My understanding is that there was only partial time sheets that were provided, and it precluded us from doing that very thing. But it's important to note that although the case, the Fox case as cited by Mr. Jones, does exist, the reality is that the Adjust-a-Card case, which was also fairly recent, does say that although you're not required to show every bit of your work, you're required to show that you did the work. And in this case, it certainly is clear that that work wasn't done. So why isn't an approach adequate where the judge says, I think this is the right amount, and the opposing party, the party who's being subjected to the fee of work, can come in and say, no, that's too much, and here's why. And then the district court has to make a ruling on whether the award is too high. If we had had that opportunity, I think that would have been an important safeguard. In this circumstance, we had briefing that was done in January of 2015. The order that she entered on fees did not take place, or it was not signed until March of 2016. During the passage of that time, there was no supplemental briefing, there was no oral argument, and we had no opportunity to be heard on that issue. That certainly is an issue that we would like to be heard on. How much in the way of fees did the defendants seek? Did they allocate? Is the million dollars something they sought, or that was a number the judge came up with? No, Your Honor, I'm in overtime now, but that's a number the judge came up with. The full amount was $2.8 million that were requested. She said that she was awarding approximately half the fees, but it was something closer to a third, without any explanation of what the basis for that arbitrary selection was. Did you ever give her a number of what you thought was appropriate if she did award fees? No, Your Honor, this wasn't a situation where we proposed that there was a certain fee amount. We did say that we believed it should be tied to the single issue on which the defendants had prevailed below, which was the 101 finding. Thank you, counsel. We'll take the case under review. Thank you, Your Honor.